UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
**CENTRAL DIVISION at LEXINGTON**

TAMMIE WELLS,                        )
                                     )
        Plaintiff,                   )
                                     )        Civil Case No.
v.                                   )        16-cv-262-JMH
                                     )
NANCY A. BERRYHILL, ACTING           )
COMMISSIONER OF SOCIAL               )
SECURITY,[1]                         )        **MEMORANDUM OPINION & ORDER**
                                     )
        Defendant.                   )

                             ***

     This  matter  is  before  the  Court  upon  cross  motions  for
summary judgment [Des 10 and 12].  For the reasons stated below,
the  Acting  Commissioner's  motion  for  summary  judgment  will  be
granted.

     The  Court's  review  of  the  Acting  Commissioner's  decision
concerning  disability  upon  reconsideration  is  limited  to  an
inquiry  into  whether  the  findings  of  the  Acting  Commissioner  are
supported  by  substantial  evidence,  and  whether  the  correct  legal
standards  were  applied.  *See* 42 U.S.C. § 405(g); *Richardson v.
Perales*, 402 U.S. 389, 390, 401 (1971).  Further, this Court's
review  is  limited  "to  the  particular  points  that  [the  claimant]
appears  to  raise  in  [his]  brief  on  appeal."  *Hollon v. Comm'r of
Soc. Sec.*, 447 F.3d 477, 491 (6th Cir. 2006).

_____
[1] The  caption  of  this  matter  is  amended  to  reflect  that  Nancy A. Berryhill
became  the  Acting  Commissioner  of  Social  Security  on  January  23,  2017,
replacing Carolyn W. Colvin in that role.

Tammie Wells ("Wells" or "Plaintiff") filed an application for Disability Insurance Benefits and Supplemental Security Income on April 25, 2013, alleging disability commencing on November 5, 2010. [R. 215]. After being denied initially and upon reconsideration, Wells filed a Request for Hearing on October 16, 2013. [R. 162]. Her case was heard by Administrative Law Judge (ALJ) Gloria B. York, who issued an unfavorable decision on January 27, 2015. [R. 27-50].

In her denial decision, the ALJ found Wells could perform medium exertion work, with restrictions to perform only routine repetitive tasks with occasional interaction with supervisors and coworkers, no interaction with the general public and no fast-paced work. [R. 36]. Wells contends this finding is not supported by the treating or examining evidence of record.

Wells further contends when determining Ms. Wells' Residual Functional Capacity (RFC), the ALJ failed to give proper weight to the well-supported, disabling opinions of the consultative examiner. The ALJ, in Wells's view, also erroneously attributed the claimant's serious mental health problems to past drug use, and in discrediting the claimant's testimony.

Plaintiff was 43 years old as of the date of the ALJ's decision [R. 55, 215, 222]. She has a high school equivalent education has a waste disposal attendant and industrial cleaner

[R. 73, 228-37, 239, 259-67].    She alleged disability since November 5, 2010 [R. 215], due to depression; bipolar, psychotic, and post-traumatic stress disorders; and an irregular heartbeat [R. 248, 279-81, 296, 299].

On March 23, 2012, Plaintiff presented to Good Samaritan Hospital after "doing odd things" over the prior three days [R. 311]. A toxicology screening was positive for methamphetamine [R. 311]. She underwent treatment with Risperdal (an antipsychotic)[R. 313]. The following day, she appeared closer to baseline, either because of the effects of methamphetamine wearing off or the medications [R. 313]. Six days later, she was diagnosed with psychotic disorder not otherwise specified for substance-induced psychosis [R. 311] and discharged with prescriptions for medications [R. 313].

In April 2012, Plaintiff presented to Diana Ball, CSW, for psychotherapy [R. 356]. She reported that she continued to use methamphetamine after her hospitalization and did not want to be there [R. 356-57].

A month later in May 2012, she complained to Michelle Walden, APRN, of depression[R. 361].    She said she had not used alcohol or illicit drugs for a month [R. 362].    Ms. Walden diagnosed polysubstance abuse and post-traumatic stress and mood disorders [R. 365].

In February 2013, Plaintiff presented to Teresa Casey, APRN, with complaints of high blood pressure, chronic obstructive pulmonary disease (COPD), depression, and bipolar disorder [R. 376]. Ms. Casey diagnosed cardiac dysrhythmia and hypertension [R. 378]. Later that month, she underwent an electrocardiogram stress test, which did not produce chest pain and showed no ectopy or arrhythmia [R. 391-92].

On June 5, 2013, Marc Plavin, Ph.D., examined Plaintiff at the request of the state agency [R. 339-46]. Plaintiff said she could perform tasks associated with using the telephone and postal service, budgeting her money, toileting, bathing, feeding, dressing, going to the grocery store, doing her laundry and dishes, cooking, sweeping, mopping, and vacuuming independently without supervision [R. 344]. She reported a history of sexual abuse, sad moods, agitation, anxiety, auditory hallucinations, and sleep disturbance [R. 345]. She said she used methamphetamine on a regular basis for a year and a half ending six months prior [R. 345].

Dr. Plavin found that she was well oriented and had a good memory and judgment; fair ability to calculate and reason abstractly; and fair to poor fund of information [R. 345]. Dr. Plavin diagnosed posttraumatic stress disorder (PTSD) with psychotic symptoms; rule out psychotic disorder; methamphetamine abuse in early full remission; and history of alcohol abuse [R.

345]. He said Plaintiff had good ability to conduct her activities of daily living and understand and remember simple instructions; fair ability to interact socially with people that she knew and sustain concentration, persistence, or pace; and poor ability to interact socially with the public and people at work, tolerate stress, and respond to the pressures of a day-to-day work setting [R. 346]. No objective testing was performed by Dr. Plavin.

On June 13, 2013, Judith LaMarche, Ph.D., a state agency psychologist, reviewed the evidence and said Plaintiff would perform best in a position with the demands of only simple, routine, repetitive tasks in a low public exposure setting with little time pressure [R. 81-94].

Plaintiff continued to see Ms. Walden from June 2013 to July 2014. In August 2013, she said she started taking Abilify (an antipsychotic) after she stopped taking Risperdal on her own and was experiencing psychotic symptoms [R. 348]. She stated she had not used illicit drugs for eight months [R. 348]. Ms. Walden diagnosed PTSD, amphetamine abuse, and a mood disorder [R. 350] and adjusted Plaintiff's medications [R. 351].

In September 2013, Diosdado Irlandez, M.D., a state agency physician, reviewed the evidence and said Plaintiff did not have a severe physical impairment [R. 111-24].

Later that month, Plaintiff told Ms. Walden that she took Prozac (an antidepressant) and had a stable mood [R. 410]. She also reported that she had been sober for nine to 10 months [Tr. 410].

In January 2014, Plaintiff presented to Ms. Walden, requesting a change in her Risperdal [R. 401]. She reported that she had not relapsed on methamphetamine in over 12 months [R. 401]. Ms. Walden described Plaintiff's mood as "stable" and said she was "best [she had] ever seen her" [R. 402]. She prescribed medications, including Geodon (an antipsychotic), Prozac, and Risperdal [R. 403].

Later that month, Plaintiff presented to Renee Fuller, M.D., with complaints of COPD [R. 416]. Dr. Fuller found that she had clear lungs with no wheezing, rales, or rhonchi and prescribed medications, including Albuterol (a bronchodilator) [R. 418].

In March 2014, Plaintiff told Ms. Walden that she stopped taking her medications due to weight gain and never picked up her Geodon, and requested that she re-start her medications [R. 420]. Ms. Walden prescribed Geodon and Prozac [R. 422].

On April 10, 2014, police took Plaintiff to the emergency room after she got into an argument with her boyfriend and cut herself on her right leg [R. 490]. She also said she fell off a porch, striking her head, after drinking that night [R. 490]. A

6

head CT scan showed no acute intracranial abnormalities [R. 470]. She was diagnosed with right leg laceration, alcohol intoxication, and a mild closed head injury [R. 492].

On April 15, 2014, Plaintiff presented to Sherene El-Sioufi, D.O., with complaints of allergies, asthma, and dyspnea [R. 423]. Dr. El-Sioufi found that Plaintiff had no rales, rhonchi, or wheezing, but diminished air movement [R. 425]. She diagnosed dyspnea secondary to severe COPD and obstructive sleep apnea and prescribed Symbicort, Spiriva (bronchodilators) and Albuterol [R. 425].

A week later, Plaintiff returned to Ms. Walden, reporting that she felt more anxiety, agitation, and anger [R. 526]. She said her boyfriend was supportive and she got outdoors more, which improved her mood [R. 526]. Ms. Walden found that Plaintiff was fidgety in her chair [R. 527] and adjusted her medications [R. 528].

On May 1, 2014, a polysomnogram study was consistent with obstructive sleep apnea [R. 427-30]. In June 2014, Plaintiff told Ms. Walden that her mood was better [R. 522]. She also said she heard voices on occasion, but her increased Geodon helped [R. 522]. Ms. Walden adjusted her medications [R. 525].

In July 2014, Plaintiff presented to Anna Duncan, LPC, for psychotherapy [R. 530]. Plaintiff said she was "doing okay" on her medicine and did not need therapy [R. 531]. Ms.

Duncan noted that Plaintiff appeared resistant to new coping skills [R. 531]. She said she was not responsive to treatment and did not want to continue in counseling [R. 531].

The following month, Plaintiff presented to Jo Noel, ARNP [R. 566]. She said she wanted to get her prescriptions "straightened out" so she would be easier to deal with [R. 567]. She said her medications were working, other than she could not relax [R. 567]. She stated she last used methamphetamine two years prior [R. 567]. She complained of auditory hallucinations [R. 567]. Ms. Noel diagnosed schizoaffective disorder and prescribed medications, including Latuda (medication for bipolar disorder) [R. 568].

On September 4, 2014, Plaintiff told Ms. Noel that she was angry all of the time [R. 563-64] and Ms. Noel prescribed Depakote (a mood stabilizer) [R. 565]. The following day, Plaintiff presented for pulmonology treatment and her medications were continued [R. 548-51].

On September 16, 2014, Plaintiff complained to Ms. Noel of increased anxiety and sleep problems [R. 560]. Ms. Noel prescribed Latuda and Remeron (an antidepressant)[R. 562].

Two weeks later, Plaintiff reported that Latuda was helping her somewhat [R. 557]. Ms. Noel found that Plaintiff had some improvement in her insight and judgment [R. 559].

In October 2014, Plaintiff presented to Dr. Fuller with complaints of swelling in her face, hands, and feet that occurred intermittently for years [R. 532]. She also complained of lower back pain that worsened with standing or bending, and that radiated in to her hips and legs [R. 532-34]. Dr. Fuller diagnosed likely muscular and facet arthropathy [R. 534]. She prescribed medications and recommended physical therapy [R. 534-35]. Later that month, Plaintiff said her dyspnea improved with Symbicort, Spiriva, and Singulair (medication for allergies) and continued to use her Albuterol inhaler and nebulizer [R. 543-46].

In November 2014, Plaintiff reported that she continued to have significant trouble with anger and "hated" people [R. 553]. She said she experienced two panic attacks per day for the prior two weeks [R. 553]. Ms. Noel prescribed Lithium (a mood stabilizer) and Trazodone [R. 555].

A week later, she said her medications seemed to be working [R. 581]. She said she often felt angry, but did not act on it [R. 581].

From November 12 to 19, 2014, Plaintiff underwent a physical therapy evaluation and three therapy sessions for her lower back and right leg pain [R. 571-77]. During the evaluation, she said she tended to her personal grooming and

drove a car [R. 574]. She said she performed most housekeeping and cooking chores with some help from her boyfriend [R. 574].

On November 20, 2014, Plaintiff said she stayed home because she felt angry in public [R. 578]. She said she ran out of Latuda and had not yet picked up a prescription for Prazosin (an antihypertensive) and had panic attacks [R. 578].

The ALJ held a hearing. At the hearing, Plaintiff testified that she stopped working in November 2010 due to mental health issues and because she had difficulty breathing due to COPD and asthma [R. 60-61]. She said her breathing problems were the greatest deterrent to working and she could perform physical activities for only short periods [R. 61]. She said she took medications for her breathing and a rescue inhaler [R. 61]. She also alleged she had bipolar disorder [R. 61]. She denied using methamphetamine or cocaine for the prior three or four years [R. 62]. She said she had problems going out in public and had panic attacks sometimes twice a day and other times three times per week [R. 63, 65]. She said that she, and her boyfriend, watched television, shopped late at night, cleaned, read, and took care of her dogs [R. 66-68, 71]. She said she could lift and carry 20 pounds and stand or walk for 15 minutes [R. 68]. She said she had difficulty sleeping due to hearing noises, nightmares, and fear that someone would harm her

[R. 69-70]. She said she had difficulty leaving her home [R.69-71].

In evaluating Plaintiff's claim, the ALJ followed the five-step sequential evaluation set forth in the agency's regulations for determining disability. See 20 C.F.R. § 404.1520(a)(4). As relevant here, the ALJ found that Plaintiff had the residual functional capacity for a range of medium work with limitations as follows:

> [She] requires a clean air environment and cannot be exposed to respiratory irritants; and is limited to routine, repetitive tasks which require only occasional interaction with supervisors and coworkers and no interaction with the public in a job which is not fast paced.

[R. 36-43]. Proceeding to step five, based on vocational expert testimony, the ALJ found that Plaintiff could perform other work existing in significant numbers in the national economy, including the jobs of assembler or bench worker, medium exertion machine tender, and light exertion machine tender [R. 44]. Thus, the ALJ found that Plaintiff was not disabled [R. 45].

As set out above, the Court's review of the Commissioner's decision is limited to an inquiry into whether the findings of the Commissioner are supported by substantial evidence and whether the correct legal standards were applied. See 42 U.S.C. §§ 405(g), 1383(c)(3); *Richardson v. Perales*, 402 U.S. 389, 390, 401 (1971). "The substantial evidence standard is met if a reasonable mind might accept the relevant evidence as adequate

11

to support a conclusion." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal citations omitted).

Plaintiff bases her attack on the Commissioner's decision on the notion that the ALJ erred by not reasonably evaluating the opinions of Dr. Plavin, an examining physician, that she had "poor" abilities to interact socially with the public and people at work, tolerate stress, and respond to the pressure of a day-to-day work setting, in evaluating her residual functional capacity [Pl.'s Br. at 6-8]. The Court rejects this argument.

Residual functional capacity "is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations that may affect his or her ability to do work related physical and mental activities." Social Security Ruling (SSR) 96-8p, 1996 WL 374184, at *2. It is the most that a person can do, despite her limitations. *See id.* In making this finding, an ALJ must decide what weight, if any, to give to the medical opinions of record. "Medical opinions" are defined as

> [S]tatements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis, and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions.

20 C.F.R. § 404.1527(a)(2). Some "medical opinions" are entitled to "controlling weight." *See id.* § 404.1527(c)(2). To be eligible for controlling weight, an opinion must be a medical opinion and must also (1) come from a treating source, i.e., an acceptable medical source "who provides you, or has provided you with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you," *id.* § 404.1502; (2) be "well-supported by medically acceptable clinical and laboratory diagnostic techniques"; and (3) be "not inconsistent" with the other substantial evidence in the case record. SSR 96-2p, 1996 WL 374188, at *2. If no opinion is entitled to controlling weight, the agency considers several factors in deciding how much weight to give to an opinion, including the nature of the medical source's relationship with the claimant, supportability, consistency, specialization, and any other factors that tend to support or contradict the opinion. *See* 20 C.F.R. §§ 404.1527(c)(1)-(6).

As the ALJ found, however, Dr. Plavin's opinions that Plaintiff had poor abilities to interact socially with the public and people at work, tolerate stress, and respond to the pressures of a day-to-day work setting was not consistent with his own examination [R. 43]. In June 2013, he found that that Plaintiff was well oriented and had good memory and judgment; fair ability to calculate and reason abstractly; and fair to

13

poor fund of information [R. 345].   20 C.F.R. § 404.1527(c)(3)
("The more a medical source presents relevant evidence to
support an opinion, particularly medical signs and laboratory
findings, the more weight we will give that opinion."); *Cutlip
v. Sec'y of Health & Human Servs*., 25 F.3d 284, 287 (6th Cir.
1994) (physician opinions "are only accorded great weight when
they are supported by sufficient clinical findings and are
consistent with the evidence.").

As the ALJ also found, Dr. Plavin's opinions that Plaintiff
had "poor" abilities to interact socially with the public and
people at work, tolerate stress, and respond to pressure were
based primarily on her subjective complaints [R. 43]. *See* 20
C.F.R. § 404.1527(c)(3); *Tate v. Comm'r of Soc. Sec*., 467 F.
App'x 431, 433 (6th Cir. 2012) (affirming the ALJ's decision not
to give controlling weight to an opinion that was based on
subjective complaints as opposed to objective findings).   As the
ALJ further, found, Dr. Plavin based these opinions on a one-
time examination of Plaintiff [R. 43]. *See* 20 C.F.R. §
404.1527(c)(2)(ii) (stating an ALJ must consider whether the
source has provided treatment for the impairment in question).
For all of these reasons, the ALJ reasonably accorded only
"limited weight" to Dr. Plavin's opinions that Plaintiff had
"poor" abilities to interact socially with the public and people
at work, tolerate stress, and respond to pressures in the

14

workplace [R. 43]. The Court notes that Dr. Plavin performed no objective testing of Wells.

Plaintiff next argues that the ALJ erred because he did not explain the weight he gave to the opinions of the state agency physicians and psychologists [Pl.'s Br. at 7]. Immediately following her evaluation of Dr. Plavin's opinions, however, the ALJ said that her "conclusion that [Plaintiff] was not disabled is further supported by the opinion of the state agency psychological consultant[s]" [R. 43]. Thus, the ALJ clearly gave greater weight to the opinions of Drs. LaMarche and Perritt than the opinions of Dr. Plavin. This, Plaintiff contends, is error as well. However, an ALJ can give greater weight to the opinions of state agency physicians or psychologists where those opinions are consistent with the record as a whole. 20 C.F.R. § 404.1527(f)(2)(i) (State agency medical consultants "are highly qualified physicians, psychologists, and other medical specialists who are also experts in Social Security disability evaluation"); *Moon v. Sullivan*, 923 F.2d 1175, 1179, 1183 (6th Cir. 1990) (ALJ reasonably relied on reviewing source opinions).

Plaintiff next argues that the ALJ erred because he did not reasonably evaluate her subjective complaints in determining her residual functional capacity [Pl.'s Br. at 8-9]. In raising this challenge, Plaintiff makes an abbreviated argument that the ALJ erred by not specifically enumerating her PTSD as a severe

impairment [Pl.'s Br. at 8-9]. The ALJ, however, found that Plaintiff had multiple severe mental impairments, including substance-induced psychotic disorder, history of methamphetamine abuse in reported remission, and mood and antisocial personality disorders [R. 33]. The ALJ considered all of Plaintiff's mental impairments, including her PTSD, in finding that she had the residual functional capacity for a range of medium work with limitations as set forth above [R. 33-43]. The ALJ, therefore, did not err by omitting Plaintiff's PTSD from the list of her severe impairments. *Anthony v. Astrue*, 266 F. App'x 451, 457 (6th Cir. 2008) (unpublished) ("[Claimant] cleared step two of the analysis. This caused the ALJ to consider [claimant's] severe and nonsevere impairments in the remaining steps of the sequential analysis. The fact that some of [claimant's] impairments were not deemed to be severe at step two is therefore legally irrelevant").

Returning to the ALJ's treatment of Wells's subjective complaints, the agency's regulations describe a two-step process for evaluating a claimant's subjective symptoms. First, an adjudicator must consider whether there is an underlying medically determinable physical or mental impairment(s) that could reasonably be expected to produce the claimant's pain or other symptoms. Second, once an underlying impairment(s) that could reasonably be expected to produce the individual's pain or

16

other symptoms has been shown, the adjudicator must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the claimant's ability to do basic work activities. *See* 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2.5   In so doing, adjudicators consider factors such as the objective medical evidence; the claimant's activities; the type, dosage, effectiveness, and side effects of any medication that the claimant takes or has taken to alleviate her symptoms; and any other factors concerning the claimant's functional limitations and restrictions due to her symptoms. *See id.*

ALJ found, and the Court agrees, that Plaintiff's noncompliance with treatment was inconsistent with her subjective complaints [R. 40, 42]. When she saw Ms. Ball in April 2012, she said she did not want to be there [R. 356-57].  In August 2013, Plaintiff said she started taking Abilify after she stopped taking Risperdal on her own [R. 348].  In March 2014, she said she stopped taking her medications due to weight gain and never picked up her Geodon [R. 420].  The following July, Ms. Duncan noted that Plaintiff appeared resistant to learning new coping skills, was not responsive to treatment, and did not want to continue in counseling [R. 531].  In November 2014, Plaintiff said she ran out of Latuda and had not yet picked up her Prazosin

[R. 578]. *See* 20 C.F.R. § 404.1529(c)(4) (stating an ALJ must consider inconsistencies in the evidence).

As the ALJ found, the record contains evidence that medications helped Plaintiff's symptoms detracted from her subjective complaints [R. 41]. In September 2013, Plaintiff told Ms. Walden that she took Prozac and had a stable mood [R. 410]. In January 2014, Ms. Walden described her mood as "stable" and said she was the "best [she had] ever seen her" [R. 402]. The following June, Plaintiff told Ms. Walden that her mood was better and, while she heard voices on occasion, her increased Geodon helped [R. 522]. In August 2014, she said her medications were working, other than she could not relax [R. 567]. In September 2014, Plaintiff told Ms. Noel that Latuda helped her somewhat [R. 557]. In October 2014, Plaintiff said Symbicort, Spiriva, and Singulair improved her dyspnea [R. 543-46]. In November 2014, Plaintiff said her medications seemed to be working. *See id.* § 404.1529(c)(3)(iv) (stating an ALJ must consider the effectiveness of treatment); *Torres v. Comm'r of Soc. Sec.*, 490 F. App'x 748, 754 (6th Cir. 2012) (unpublished) (the fact that Plaintiff's symptoms "often improved with medication and treatment" undercuts the claimed severity of her impairments).

The record demonstrates that Plaintiff's activities of daily living undermined her subjective complaints [R. 35, 37-38,

42]. In June 2013, she said she could perform tasks associated with using the telephone and postal service, budgeting her money, toileting, bathing, feeding, dressing, and going to the grocery store, doing her laundry and dishes, cooking, sweeping, mopping, and vacuuming independently without supervision [R. 344]. In April 2014, she reported that she got outdoors more, which improved her mood [R. 526]. In November 2014, she said she performed most housekeeping and cooking chores with some help from her boyfriend [R. 574]. At the administrative hearing, she said she, and her boyfriend, watched television, shopped late at night, cleaned, read, and took care of her dogs [Tr. 66-68, 71]. *See* 20 C.F.R. § 404.1529(c)(3)(i) (stating an ALJ must consider a claimant's activities); *Torres,* 490 F. App'x at 754 (allegations of impairments could be considered inconsistent with claimant's own testimony about the daily activities she is able to perform). Moreover, Plaintiff's demeanor at the hearing also contradicted her subjective complaints [R. 42]. At the hearing, she had no difficulty responding to questions and providing logical answers, and she did not demonstrate any behavior consistent with psychosis [R. 51-78]. *See Tyra v. Sec'y of Health & Human Servs.*, 896 F.2d 1024, 1030 (6th Cir. 1990) (ALJ could dismiss claimant's allegation of disabling pain as implausible if the objective medical evidence, claimant's

subjective allegations, and the ALJ's personal observations contradicted those allegations).

Plaintiff finally challenges an additional finding by the ALJ that her methamphetamine use damaged her credibility [Pl.'s Br. at 8]. As the Court held above, however, the ALJ considered several factors supported by substantial evidence for discounting Plaintiff's subjective complaints [R. 35-43]. Thus, even setting aside the ALJ's finding about Plaintiff's methamphetamine use, there are other valid reasons for discounting Plaintiff's complaints of disability. *Shinseki v. Sanders*, 556 U.S. 396, 409 (2009) ("the burden of showing that an error is harmful normally falls upon the party attacking the agency's determination." (citations omitted)); *Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 714 (6th Cir. 2012) ("We now make explicit what we have previously adopted by implication: harmless error analysis applies to credibility determinations in the social security disability context.").

Having reviewed the entire administrative record, the Court concludes that ALJ York's decision, which ultimately became that of the Acting Commissioner, is supported by substantial evidence.

Accordingly,

**IT IS ORDERED** herein as follows:

(1)   That  the  Acting  Commissioner's  motion  for  summary judgment [DE 12] be, and the same hereby is, **GRANTED.**

(2)   That Plaintiff's motion for summary judgment be, and the same hereby is, **DENIED.**

(3)   That the Acting Commissioner's final decision be, and the same hereby is, **AFFIRMED.**

A  separate  judgment  in  conformity  herewith  shall  this  date be entered.

This the 22nd day of June, 2017.

Signed By:

*Joseph M. Hood*

Senior U.S. District Judge